FIRST PENNSYLVANIA MORTGAGE TRUST & others[1]
*vs.* DORCHESTER SAVINGS BANK & others[2]
(and a companion case[3]).

Suffolk.   April 3, 1985. — August 8, 1985.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Practice, Civil,* Findings by judge. *Frauds, Statute of. Contract,* What
constitutes, Modification, Performance and breach. *Damages,* Breach
of contract.

At the jury-waived trial of an action arising out of an agreement among
three commercial lenders to share in financing the construction of an
apartment project the evidence warranted the judge's determination that
an oral agreement had been reached among the three lenders to participate
in an increase of the construction loan after substantial cost overruns
occurred. [620-624]
An oral modification of a written agreement among three commercial
lenders to share in financing the construction of an apartment project
was not precluded by the Statute of Frauds [624-625], by any term of
the original participation agreement [625], or by any evidence or finding
suggesting an intention on the part of one of the parties not to be bound
unless a formal document were drafted and executed [625].
At the jury-waived trial of a claim against a commercial lender which was
found by the judge to be in breach of its agreement with two colenders
to share in financing the construction of an apartment project, damages
were properly assessed against the party in breach in an amount measured
by its pro-rata share of the losses which the parties sustained on the
project. [626-628]

---

[1] Daniel S. Ahearn, Edmund N. Bacon, Richard W. Baker, Jr., John R.
Bunting, Ralph W. Ervin, Samuel Evans, III, and Philip Zinman, trustees
of First Pennsylvania Mortgage Trust. Throughout this opinion we refer to
the plaintiffs collectively as the plaintiff.

[2] National Bank of North America, Weymouthport Builders, Inc., and
Echo Module Systems, Inc.

[3] First Pennsylvania Mortgage Trust *vs.* First American Bank for Savings,
formerly known as Dorchester Savings Bank, & others.

BILL IN EQUITY filed in the Superior Court on June 20, 1974.

CIVIL ACTION commenced in the Superior Court on September 9, 1977.

The cases were consolidated for trial and were heard by *Paul G. Garrity, J.*

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Thomas D. Burns* (*Gael Mahony*, for Hallwood Group, Inc., intervener, & *Alan K. Posner* with him) for the plaintiffs.

*Jerome P. Facher* (*John G. Fabiano & Michelle D. Miller* with him) for the defendants.

ABRAMS, J. This action arises out of a participation agreement executed among colenders in February, 1972, to share in financing the construction of a rental apartment project in Weymouth. A judge of the Superior Court held the plaintiff First Pennsylvania Mortgage Trust (FPMT) liable to the defendants Dorchester Savings Bank (DSB) and National Bank of North America (NBNA) in the amount of $1,116,446 "and interest thereon from when [FPMT] reneged on the deal, i.e., August 15, 1973." The plaintiff appeals. We affirm.

We summarize the facts as found by the judge. In 1970, the Weymouthport Corporation (Weymouthport) first approached DSB seeking a loan for a residential development to be built on land owned by the company in Weymouth. Initially refused by DSB, the company turned to NBNA with the same request. Ridgely Ware, then NBNA's senior vice president, was about to depart from NBNA to become the president of Associated Advisers, Inc., an entity established to manage the investments of FPMT. Ware asked Robert Dombal, an NBNA vice president, "to reserve for [FPMT] a portion of any investment by NBNA" in Weymouthport's project. Shortly thereafter, DSB agreed to participate in NBNA's construction loan to Weymouthport. Ware, on behalf of FPMT, and Dombal, on behalf of NBNA, continued negotiations. They agreed orally that NBNA "would advance [FPMT's] share of the loan until such time when [FPMT] was in a position to do so." Pursuant to the oral agreement, NBNA advanced $773,669 on behalf of FPMT, prior to the execution of a formal participation agreement.

In February, 1972, DSB, NBNA, and FPMT entered into such an agreement, dated "as of July 14, 1971." The agreement provided that the three participants would "make an interim construction loan" of $8.5 million to Weymouthport. Of that $8.5 million, DSB would contribute $1.5 million (17.65%), NBNA would provide $4 million (47.06%), and FPMT's share would be $3 million (35.29%). As "principal," DSB was to administer disbursements of the loan to Weymouthport as well as repayments of the loan to NBNA and FPMT.[4] Pursuant to paragraph 8 of the agreement, "all loss or losses and expenses other than bookkeeping and ministerial cost [would] be borne by the parties in accordance with their respective rateable undivided interests in the Bank Loan." The participation agreement further provided as follows: "Without the prior written consent of the Participants, Principal shall not make or consent to any modification of any said documents or make or consent to any release of the Borrower from any liability thereunder or waive any claim against the Borrower . . . ."

Over the next year, it became clear that earlier cost projections had been highly optimistic: Severe cost overruns resulted from unanticipated labor problems and difficulties in the preparation of concrete modules for use in the project. In February, 1973, FPMT and DSB joined in an additional mortgage loan to Weymouthport of $2 million as a stop-gap measure. Even this proved insufficient.

In May, 1973, Dombal — now deeply concerned about serious cost overruns — requested, with the approval of DSB and FPMT, "a special study of the current status of the . . . project to determine causes of direct cost overruns and to attempt to forecast the ultimate direct cost of the completed project." The result of the study was an estimated "total direct cost for the project of $11,228,700," an "increase of 30% over the original estimate prepared in mid-1971." On May 22, 1973, a meeting of representatives of DSB, NBNA, FPMT,

---

[4] The judge found "[o]n all the evidence . . . that Dorchester performed its almost purely ministerial responsibilities under the Agreement and as 'lead' bank in a competent and businesslike manner."

and Weymouthport took place at DSB. The judge found that, at that meeting, "[a]ll agreed that it was appropriate and necessary to refinance the project and a consensus was reached that the then construction loan amount limit of $8.5 million would have to be increased to $12,550,000."

On June 1, 1973, Dombal sent letters to Ware and to Arthur Shaw, Jr., president of DSB, "enclosing . . . a rough draft of the restructuring of the Weymouthport construction loan . . . ." The draft proposed "a $4,050,000 increase over the original approval of $8,500,000. Participants . . . will share in the increased portion on the same pro-rata share as the original participation . . . ." In the letters, Dombal also wrote: "After you've had a chance to read this, please give me a call on . . . June 5th or 6th." When Ware did not telephone as requested, Dombal telephoned him. The judge specifically found "that after some discussion Ware, on behalf of AAI and [FPMT], then agreed that [FPMT] would participate as suggested during their discussions."[5] Shaw, on behalf of DSB, also agreed to the increase in the construction loan. During the summer, then, Dombal initiated the preparation of the appropriate legal documents, sought consultations with regard to accounting, financial planning, and marketing, and retained a well-known developer to finish the project.[6]

On August 15, 1973, DSB and Weymouthport signed a written amendment to the original loan agreement extending the amount of the loan from $8,500,000 to $12,550,000. Weymouthport concurrently executed a note in the amount of $12,550,000 as well as a series of mortgages. Thus, "[t]he 'deal' increasing the amount of the construction loan to

---

[5] On appeal, FPMT does not challenge the finding below that Ware possessed the express authority to commit FPMT to its pro rata share of the increase in the construction loan to Weymouthport.

[6] The judge noted that "[a]s of the beginning of August, 1973, of the three buildings planned as the first phase of the project, only one was substantially complete, another was 65% complete and construction of the largest building had not yet begun. . . . [T]here was only a very small amount of construction loan funds remaining to be advanced from the original amount borrowed . . . ."

Weymouthport 'closed' on August 15, 1973." Over the ensuing months NBNA and DSB advanced substantial funds to Weymouthport pursuant to the agreement to increase the construction loan. At one point, Dombal became concerned that he had not yet received a signed participation agreement from Ware. Ware assured Dombal that he "was in on the deal" and requested that Dombal "cover for him."

In late September or early October, 1973, Ware became "evasive" about FPMT's fulfilling its newly-incurred financial obligation. On October 10, 1973, Ware wrote Dombal as follows: "After considerable thought and with much trepidation about the future of this project, I must inform you that because of past happenings . . . I am unable to recommend to our Trustees the approval of any further increases in the above loan."

"For good business and financial reasons," the judge observed, "the project ultimately had to be restructured as a condominium development . . . ." In 1974, DSB, with the approval of NBNA, accepted a deed from Weymouthport in lieu of foreclosure. Construction was completed in 1975 and the last condominium was sold in 1979. The total costs of the completed project were $24,005,800. The project realized $11,426,095 from the sales of condominium units, $250,943 in rental income, and $26,424 from the sale of equipment.

On June 20, 1974, FPMT filed suit in the Superior Court against the defendants seeking a declaratory judgment "that Dorchester by its conduct ha[d] (a) breached its obligations under the Participation Agreement, and (b) violated its fiduciary duties, as trustee, to protect the undivided interest of [FPMT] in the construction loan."[7] On September 16, 1974, DSB and

---

[7] On September 9, 1977, FPMT commenced a separate action adding two claims: first, that the defendants, after FPMT filed its first complaint, violated both their agreement with FPMT and their fiduciary duties by releasing the contractor and the guarantors from obligations under the original loan agreement. Second, FPMT alleged that entities controlled by DSB were holding the Weymouthport project as constructive trustees for the benefit of FPMT to the extent of FPMT's interest under the participation agreement. (The latter claim was dismissed by stipulation of the parties on August 8, 1978.) On September 26, 1980, a judge of the Superior Court allowed a joint motion to consolidate the actions.

NBNA filed an answer and counterclaim. The counterclaim alleged that FPMT had breached the amended participation agreement of August 15, 1973, and had made false representations to DSB and NBNA. The jury-waived trial commenced on July 6, 1982, and concluded on September 3, 1982.

The judge rendered his decision on March 14, 1983.[8] That decision embraced four rulings of law: First, the judge held that DSB and NBNA had fulfilled all their obligations pursuant to the agreement with FPMT. Second, DSB had performed its duties toward NBNA, FPMT, and Weymouthport "in good faith" and with "good business judgment." Third, FPMT was responsible for its pro rata share of the project's losses, pursuant to the loan agreement, in the amount of $1,116,446. Last, even were the Statute of Frauds applicable to FPMT's oral agreement to the increase of the loan from $8,500,000 to $12,550,000, FPMT was "bound thereby on the basis of equitable and promissory estoppel." The plaintiff filed a notice of appeal in the Appeals Court. We transferred the appeal to this court on our own motion.

On appeal, FPMT raises several categories of error: It alleges that the judge's findings of fact were clearly erroneous; it maintains that the judge erred as a matter of law in deciding that FPMT could be held to have participated in the August 15, 1973, increase of the original loan in the absence of a written agreement; and it challenges the judge's calculation of damages.[9] We address each category of alleged error in turn.

---

[8] On April 1, 1983, FPMT filed a motion requesting that the judge amend and supplement his findings of fact and conclusions of law as well as amend the judgment. On May 3, 1983, the judge denied the motion for amendment and for supplemental findings of fact. He did, however, amend his conclusions of law. His "corrections [were] technical and [did] not go to the substance of judgment previously entered in this action."

[9] The plaintiff further asserts that the judge "made a number of critical and significant evidentiary rulings which were erroneous as a matter of law and which resulted in a pattern of findings which favored the defendants," and that the judge abused his discretion in denying FPMT's motion to amend its complaint to add a claim under G. L. c. 93A, §§ 2 and 11 (1984 ed.).

As for the evidentiary rulings complained of, those painstakingly gleaned by FPMT from the transcript are, in our view, neither critical nor significant;

1. *Allegations of factual error.* The thrust of FPMT's argument is that — whether as a matter of fact or as a matter of law — the judge erred in holding that FPMT did, through its agent, commit itself to participate with NBNA and DSB, despite the lack of a writing, in the additional $4,050,000 loan which closed on August 15, 1973. The plaintiff's initial basis of attack is that there was insufficient evidence to find that FPMT promised orally to participate in the $4,050,000 August 15, 1973, loan.[10] The plaintiff states that in relying on portions of Dombal's testimony, the judge "strain[ed] credulity to un-

---

most were discretionary. The plaintiff claims, for example, that the judge erroneously permitted Dombal to "testify as to what Ware meant" by his request that Dombal "save a piece of the deal" for FPMT. But FPMT misconstrues the judge's ruling: Dombal was permitted to testify as to his *own* understanding of Ware's statements, a fact relevant to determination of Dombal's later reliance. There was, thus, no error. The exclusion of a letter from which an enclosure was missing did not amount to an abuse of discretion. The judge gave counsel an opportunity to obtain the enclosure and also permitted oral testimony as to the contents of the letter. Last, the judge excised from an exhibit those portions concerned, for example, with the allocation of fees and disbursements between all counsel for the defendants. There was no error in excising that portion of the exhibit. In any event, FMPT has not demonstrated that any "error complained of has injuriously affected [its] substantial rights." G. L. c. 231, § 119 (1984 ed.). See G. L. c. 231, § 132 (1984 ed.).

Nor did the judge abuse his discretion in denying FPMT's eleventh-hour motion to amend its complaint. Even though the action had been pending for more than eight years, FPMT filed its motion on July 1, 1982. "When trial is as imminent as it was in this case, a judge may give weight to the public interest in the efficient operation of the trial list and to the interests of other parties who are ready for trial. In the circumstances of this case, the plaintiff was guilty of undue delay warranting the judge's denial of the motion" to amend. *Castellucci* v. *United States Fidelity & Guar. Co.*, 372 Mass. 288, 292 (1977).

[10] The judge also ruled that FPMT was bound "on the basis of equitable and promissory estoppel." Because we conclude that FPMT entered into a binding oral agreement to participate in the additional loan of $4,050,000, we do not reach FPMT's claims that there was insufficient evidence to find that: (1) FPMT participated in the original $8,500,000 loan before the participation agreement was signed; (2) had FPMT made a promise to participate in the $4,050,000 increase in August, 1973, NBNA and DSB relied on that promise in deciding to enter into the new loan; and (3) even if the defendants had relied on a promise of FPMT to participate in the additional $4,050,000 loan, such reliance was reasonable. See note 14, *infra.*

reasonable limits." The plaintiff then goes on to suggest a fact pattern from the evidence which supports its version of these events. The plaintiff's argument misperceives the scope of appellate review.

On appeal, we may not set aside findings of fact "unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." Mass. R. Civ. P. 52 (a), 365 Mass. 816 (1974). "In applying the clearly erroneous standard to the findings of a [judge] sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues *de novo.*[11] The authority of an appellate court, when reviewing the findings of a judge as well as those of a jury, is circumscribed by the deference it must give to decisions of the trier of the fact, who is usually in a superior position to appraise and weigh the evidence. The question for the appellate court under Rule 52(a) is not whether it would have made the findings the trial court did, but whether 'on the entire evidence [it] is left with the definite and firm conviction that a mistake has been committed'" (citations omitted). *Zenith Radio Corp.* v. *Hazeltine Research, Inc.*, 395 U.S. 100, 123 (1969). *New England Canteen Serv., Inc.* v. *Ashley*, 372 Mass. 671, 675 (1977).

"What this means is that [the judge's] findings 'come here well armed with the buckler and shield' of F.R.Civ.P. 52(a); *Horton* v. *U.S. Steel Corp.*, 286 F.2d 710, 713 (5th Cir. 1961); quoted with approval in 9 Wright & Miller, Federal Practice and Procedure § 2585, p. 729. See also Note, Federal Rule of Civil Procedure 52(a) and the Scope of Appellate Fact Review: Has Application of the Clearly Erroneous Rules Been Clearly Erroneous? 52 St. John's L. Rev. 68 (1977). The

---

[11] The plaintiff urges us to "draw our own conclusions from documentary evidence unaffected by the conclusions of the court below." *Ward* v. *McGlory*, 358 Mass. 322, 323 (1970). The *Ward* case was decided before we adopted Mass. R. Civ. P. 52 (a) in 1974. Rule 52 (a) requires that the "clearly erroneous" test apply "to all findings, regardless of the nature of the evidence." 9 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 2587, at 741 (1971). See *Anderson* v. *Bessemer City*, 470 U.S. 564, 573-575 (1985).

burden is squarely on the appellant to show an appellate court that a finding is clearly erroneous, *Griffin* v. *Missouri Pac. Ry. Co.*, 413 F.2d 9 (5th Cir. 1969) . . . ." *Matter of Multiponics, Inc.*, 622 F.2d 709, 723 (5th Cir. 1980). See *Alaska Foods, Inc.* v. *American Mfr.'s Mut. Ins. Co.*, 482 P.2d 842, 848 (Alaska 1971).[12]

After reviewing the record, we are not left with a firm conviction that the trial judge was mistaken. There was ample evidence to support the judge's finding that FPMT promised to participate in the additional loan of $4,050,000. Peter Weir, an attorney for NBNA, testified that at a meeting at DSB on May 22, 1973, representatives of FPMT, NBNA, and DSB reached the "understanding . . . that an additional $4,050,000 would be needed." A letter dated June 1, 1973, from Dombal to Ware contained "a rough draft of the restructuring of the Weymouthport construction loan" in which FPMT was to contribute an additional $1,430,000 (i.e., 35.29% of $4,050,000). Dombal agreed that "on the 5th or the 6th [of June], somewhere around there," he telephoned Ware and "told [Ware that he] was not going to go to the committee unless [Ware] was part of the deal, and . . . would take his proportionate share of the increase." Dombal averred that Ware told him "that he was going to be part of the deal." Dombal further stated that in late July, 1973, he and his assistant, Daniel P. Biggs, telephoned Ware to review all of the loan closing terms and the supporting documentation to be signed by the borrower; Ware approved each item. "At the conclusion of that conversation," Dombal asked Ware "if he was in the deal, and he told [Dombal] yes." Biggs's deposition confirmed that Ware "indicated his

---

[12] Even if a judge adopts verbatim findings prepared by prevailing counsel, "[t]hose findings, though not the product of the workings of the . . . judge's mind, are formally his; they are not to be rejected out-of-hand, and they will stand if supported by evidence." *United States* v. *El Paso Natural Gas Co.*, 376 U.S. 651, 656 (1964). Although we have criticized this practice, we nevertheless do not reject or set aside such findings if supported by evidence. See *Lovett* v. *Commonwealth*, 393 Mass. 444, 447 (1984); *Lewis* v. *Emerson*, 391 Mass. 517, 524 (1984); *Cormier* v. *Carty*, 381 Mass. 234, 237-238 (1980). See generally 9 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 2578, at 704-708 (1971).

approval of those terms and conditions and instructed . . . Mr. Dombal to proceed with the execution of the appropriate documentation to effect those terms and conditions." Ware himself stated that at the end of July, 1973, he and Dombal "were talking on a daily basis or almost on a daily basis."

Dombal telephoned Ware after the closing on August 15, 1973, and said that Ware reiterated "[t]hat he was in the deal . . . ." Weir testified that Ware told him in mid-September that "he anticipated having a trustee to sign [the agreement] the following week" and would then send it on. Shaw stated that on September 28, 1973, Ware once again said, "I am definitely in."

The exhibits also support the judge's determination that an oral agreement was reached among FPMT, DSB, and NBNA. Among those exhibits, a memorandum from Ware dated July 31, 1973, to a trustee of FPMT reported the "jointly reached" recommendation to "[i]ncrease loan to $12-½ million and extend the maturity date to mid 1975." An internal Associated Advisers, Inc., form reporting the status of the Weymouthport loan as of September 8, 1973, noted the following under the heading "Action Taken": "Loan increased to $12.5 million. Additional collateral taken."

The plaintiff places special emphasis on a memorandum from Biggs of September 11, 1973, which summarized the problems of the project, stating that FPMT "has refused to fund their share of construction advances, pending their own 'analysis.'" Further, FPMT points up Ware's testimony that he never acquiesced to the increased loan, and the testimony of FPMT's expert on construction lending that "it is never good banking practice to advance money, even in the best of circumstances, without a signed participation agreement."

The plaintiff asks us, in effect, to weigh the evidence supporting its position anew.[13] But there is no doubt that here the

---

[13] The plaintiff's request that we make our own findings brings to mind Judge Frank's comment that "[a] wag might say that a verdict is entitled to high respect because the jurors are inexperienced in finding facts, an administrative finding is given high respect because the administrative officers are specialists (guided by experts) in finding a particular class of

trial judge was "in a superior position to appraise and weigh the evidence." *Building Inspector of Lancaster* v. *Sanderson,* 372 Mass. 157, 161 (1977). We will not "review questions of fact found by the trial judge, where such findings are supported 'on any reasonable view of the evidence, including all rational inferences of which it was susceptible.' *Bowers* v. *Hathaway,* 337 Mass. 88, 89 (1958)." *T.L. Edwards, Inc.* v. *Fields,* 371 Mass. 895, 896 (1976). In sum, on the entire record, there is no basis for a determination that the trial judge made a mistake. *New England Canteen Serv., Inc.* v. *Ashley,* 372 Mass. 671, 675 (1977).

2. *The validity of the oral agreement.*[14] The plaintiff next contends that, as a matter of law, "FPMT cannot be found to have participated in the August 15th [1973] loan by reason of an alleged oral promise by Ridgeley Ware" and that "[i]t is therefore not bound contractually to share in the losses on that loan." The plaintiff insists that the obligation which, in other circumstances, might be imposed on FPMT by reason of an exchange of oral promises, see *Loranger Constr. Corp.* v. *E.F. Hauserman Co.,* 376 Mass. 757, 762-763 (1978), is expunged here both by the Statute of Frauds,[15] as well as by the specific provisions of the original agreement among DSB, NBNA, and FPMT. We do not agree.

---

facts, but, paradoxically, a trial judge's finding has far less respect because he is blessed neither with jurors' inexperience nor administrative officers' expertness." *Orvis* v. *Higgins,* 180 F.2d 537, 540 n.7 (2d Cir.), cert. denied, 340 U.S. 810 (1950).

[14] The judge held that "[e]ven assuming that the Statute of Frauds technically applies to [FPMT's] oral commitment to participate financially *pro rata* in the parties' agreed-to increase in the construction loan to Weymouthport, I specifically find and rule that [FPMT] is bound thereby on the basis of equitable and promissory estoppel." Because we conclude that the Statute of Frauds is inapplicable, we do not reach the question whether FPMT could have become obligated under principles of estoppel.

[15] General Laws c. 259, § 1 (1984) ed.), provides in relevant part that "[n]o action shall be brought . . . [u]pon a contract for the sale of lands, tenements or hereditaments or of any interest in or concerning them . . . [u]nless the promise, contract or agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or by some person thereunto by him lawfully authorized."

The Statute of Frauds is not germane to the transactions involved. Both the written participation agreement of 1972 and the oral agreement of 1973 were contracts of "joint adventure and for the division of profits and losses resulting therefrom." 2 A. Corbin, Contracts § 411, at 420 (1950). "Such joint venture contracts involving transactions in land are generally held not to be within the statute of frauds, and therefore, may be oral." 2 S. Williston, Contracts § 319, at 634 (3d ed. 1959). See *Fencer* v. *Wills*, 259 Mass. 546, 549 (1927) ("The subject matter of the agreement concerned alone the matter of profits and losses arising, or which might arise, from the sale of lands purchased and held under the terms of the agreement. We think the agreement is not a contract for the sale of lands or any interest in land . . .").

Nor do the "clear terms" of the original participation agreement, requiring prior written consent to any modification, nullify the subsequent oral agreement of August, 1973. "It is a settled 'principle that the mode of performance required by a written contract may be varied by a subsequent oral agreement based upon a valid consideration.' *Siegel* v. *Knott*, 316 Mass. 526, 528 (1944)." *Wesley* v. *Marsman*, 393 Mass. 1003, 1004 (1984). Here, the "valid consideration" consisted of the promises of NBNA and DSB to invest their pro rata shares of the loan increase. Mutual agreement on modification of the requirement of a writing may, moreover, "be inferred from the conduct of the parties and from the attendant circumstances" of the instant case. *Flynn* v. *Wallace*, 359 Mass. 711, 715 (1971). There was no evidence or finding suggestive of the intention of FPMT not to amend the contract unless all written documents were drafted and signed and a formal amendment to the participation agreement was executed. To the contrary, the judge found that Ware "unequivocally" indicated his approval "of the many pertinent details" of the deal in late July, 1973: "Ware did not indicate any disagreement either with the concept or with the terms of the proposed amendment to the Agreement." We concluded that there was no error of law in the judge's determination of FPMT's "oral commitment to participate financially pro rata in the parties' agreed-to increase in the construction loan to Weymouthport."

3. *The computation of damages.* In their counterclaim for breach of contract, NBNA and DSB sought "damages either for the sum of $1,400,028.04, which is [FPMT's] alleged *pro rata* share of the increase in the construction loan purportedly agreed-to by it or for the sum of $1,116,446 which is claimed to be [FPMT's] *pro rata* share of the total losses sustained by the parties on the project." The judge held FPMT "responsible for its *pro rata* share of the project's losses in the sum of $1,116,446 pursuant to paragraph numbered 8 of the [participation] agreement."[16]

On appeal, FPMT argues that the measure of damages is incorrect. It maintains that "[t]he key flaw in the [judge's] legal analysis is its implied finding that paragraph 8 of the Participation Agreement covering the $8.5 million loan extends to the entire $24 million" ultimately expended for completion of the project. FPMT reasons that such an interpretation of paragraph 8 locks "FPMT into 35.29% of unlimited losses, whether approved by FPMT or not, and whether 5, 10 or even 100 million dollars." The plaintiff asserts, moreover, that "even if FPMT must further share in the 'burdens' of the Project by contributing funds to the second loan, it is entitled also to share fully in the proceeds derived from that loan."[17]

We reject this characterization of FPMT's entitlement, a characterization which neglects the core fact, as found by the judge, that "[FPMT] reneged on the deal." The plaintiff did

---

[16] The judge found that "the 'losses' for the project's three participants total[led] $11,746,426." He derived that figure by deducting "net proceeds from the sales of condominium units plus other income . . . from the project's total costs of $24,005,800 . . . . [FPMT's] percentage share (35.29%) of those losses ($4,145,313) . . . less what it advanced ($3,028,867) results in a *pro rata* loss attributable to it of $1,116,446."

[17] The plaintiff proffers three formulae for the calculation of damages. It claims that it is owed either: (1) a 35.29% share, or $3 million, of the first $8.5 million in proceeds from the project; or (2) 35.29% of the total project proceeds ($4 million) minus the $1.4 million which it would owe as its share of the 1973, $4.05 million loan — a net award of $2.6 million to FPMT; or (3) 35.29% of the proceeds attributable to the project as of the time of the depletion of the initial investment of $12,550,000 minus FPMT's $1.4 million share of the loan increase, or "a net award to FPMT of almost $1 million."

not fund its pro rata share of the increase in the construction loan, and repudiated the agreement, through its agent Ware, by letter on October 10, 1973. Where a party violates "a contract to invest money in an enterprise . . . substantial damages may be recovered." 5 A. Corbin, Contracts § 1078, at 450 (1964). The court may award such damages "as may be presumed to have been in the contemplation of the parties at the time the contract was made." *Bucholz* v. *Green Bros.*, 272 Mass. 49, 54 (1930).

The plaintiff contends that it never contemplated liability for a pro rata share of "unlimited losses" and that the judge's computation of damages was, therefore, erroneous. We disagree. At the point at which it acquiesced in the modification of the participation agreement, FPMT manifested its willingness to risk up to 35.29%, i.e., its pro rata share, of $12,550,000. In a joint venture such as that among FPMT, DSB, and NBNA, "no financial return is promised the party supplying the capital. In exchange for a share in the earnings and residue, he takes the risk of failure of the enterprise and of total loss." *Martin* v. *Ajax Constr. Co.*, 124 Cal. App. 2d 425, 433 (1954).

The judge, then, simply held FPMT to its promise. He found the plaintiff liable for its pro rata share of the project's losses, losses which did not exceed $12,550,000. Thus, FPMT's argument that the damages here were beyond its contemplation is specious. That the judge's explication of his reasoning was elliptical does not undermine the soundness of his resolution of the issue.

Moreover, the judge, in calculating damages, *did* factor in share of the "proceeds" due the plaintiff. By first deducting the income of the project from the total expenditures on the project, before calculating FPMT's share of the losses, see note 16, *supra*, he, in effect, gave FPMT credit for 35.29 cents on each dollar by which the "proceeds" brought the total losses below $12,550,000. Arguably, he might have held FPMT liable for a full 35.29% of $12,550.000.[18] The result, however, was

[18] The defendants have not cross appealed on the issue of damages. We, therefore, have no reason to consider whether the damages were inadequate. " [F]ailure to take a cross appeal precludes a party from obtaining a judgment

that the trust was found liable in an amount *less* than that which FPMT had promised to risk. We conclude that there is no basis on which to disturb the assessment of damages.

*Judgment affirmed.*

---

more favorable to it than the judgment entered below." *Boston Edison Co.* v. *Boston Redevelopment Auth.*, 374 Mass. 37, 43 n.5 (1977), and cases cited.