I2DALEY, Judge.
Biltrite Corporation, Endura Flooring Division (Biltrite), appeals a judgment in favor of Hi-Tech International, Inc. (Hi-Tech), finding that Biltrite breached its distributorship contract with Hi-Tech. Biltrite also appeals the award of damages to Hi-Tech. Hi-Tech answered the appeal, seeking an increase in damages and further damages for frivolous appeal. We affirm.
Biltrite is the manufacturer of a rubber flooring known as Endura. In December of 1986, Biltrite entered into a regional distributorship agreement with Hi-Tech, where Hi-Tech represented and sold the Endura flooring over an exclusive territory in the south. Hi-Tech’s principal was Gustave J. Guinch-ard III. William L. Bath, Jr. was an independent sales representative for Hi-Tech. The distributorship agreement contained the following pertinent provisions regarding amendment of the agreement and its termination:
8. (a) The term of this Agreement shall be for a period of one (1) year from the date hereof and shall continue 1thereafter subject to termination by either party upon written notice to the other of at least six (6) months in advance of the termination date to be specified in the notice.
(b) Notwithstanding the provisions of sub-paragraph (a) above, in the event either party shall materially breach any of the terms, conditions and covenants contained in this Agreement to be kept, observed and performed by it, then the other party may terminate this Agreement at its option without prejudice to any of its other legal and equitable rights and remedies, by giving the other party sixty (60) days notice in writing, which notice shall particularly specify the breach, unless the notified party within such (60) day period shall have rectified the breach.
*294 (e) BILTRITE may immediately terminate this Agreement by written notice in the event DISTRIBUTOR shall become insolvent or shall suspend operation of its business.
:{: * sfi ff: *
(e) Except as expressly provided herein neither party shall incur any liability to the other upon or arising from the termination of this Agreement. DISTRIBUTOR specifically acknowledges and agrees that it shall have no claim for loss of business, loss of goodwill or any other loss by reason thereof.
‡ ‡ ‡ ‡ ‡ ‡
12. This Agreement supercedes [sic] any and all previous understandings, agreements and commitments between the parties, and may not be changed in any way except by an instrument in writing, signed by both parties. The failure of BILTRITE to enforce at any time any of the provisions, rights or terms hereof shall not be considered or be deemed to be a waiver of such provisions, rights or terms. This Agreement shall be construed and interpreted under the laws of the Commonwealth of Massachusetts.
According to Biltrite, in 1990, the parties orally agreed to a modification of Hi-Tech’s territory, during a telephone call. Biltrite sent Hi-Tech a confirmation letter, which it did not require Hi-Tech to sign. This procedure did not comply with the technical requirements of Paragraph 12 of the Distributorship Agreement, although Hi-Tech agrees that the territory was changed.
|4In 1989, William Bath of Hi-Tech began working to obtain the contract for Endura rubber flooring to be used in renovations of the Superdome. The job was potentially one of Biltrite’s and Hi-Tech’s largest, as it would require over 100,000 square feet of new flooring for two concourses at the Super-dome. Years of Bath’s hard work paid off when Hi-Tech’s bid, specifying the use of Endura flooring, was accepted in late 1992.
Around the time that the Superdome project was in progress, Biltrite alleges in brief that Hi-Tech began experiencing substantial difficulty in meeting its obligations under the distributorship agreement. These alleged difficulties included Hi-Tech’s inability to extend credit to its customers, and keeping its account current with Biltrite. Biltrite’s concerns about Hi-Tech’s credit and delinquent account prompted it to structure the Super-dome sale in a way not previously used. In the ordinary case, assuming the existence of a financially sound distributor, Biltrite would sell the Endura flooring to its distributor, who would then resell the floor to the end user. Here, Biltrite sold the Endura flooring directly to the Superdome’s flooring subcontractor, Olde Tyme Flooring, accepted payment directly from Olde Tyme, and then remitted to Hi-Tech a sum equal to the gross profit it would have earned had it made the sale directly.
Despite the allegations about Hi-Tech’s financial situation, Biltrite did not seek to terminate the distributorship agreement under paragraph 8(b).
In February of 1993, President of Biltrite’s Endura Division, James Hill, met with Endu-ra’s regional manager, Dan Kelly, to discuss its continued relationship with Hi-Tech. At trial, the men characterized their aim as a “modification” of their relationship with Hi-Tech, although in previous deposition testimony they used the word “terminate” when discussing the course of action they had decided upon. They 1 .¡contacted Mr. Guinchará and set up a meeting between the three at the New Orleans Airport Hilton on February 19,1993. Kelly testified at trial that prior to the meeting, Biltrite decided to “modify” or “terminate” their distributorship agreement with Hi-Tech, but did not advise Guinchará of the meeting’s purpose beforehand.
Biltrite sent Hi-Tech a letter, dated February 22, 1993, memorializing the substance of their meeting with Guinchará three days earlier. Among other things, this letter stated in Paragraph One that the appointment of Hi-Tech International as Endura distributor was terminated as of Friday, February 19, 1993. No additional Hi-Tech orders would be accepted, although existing orders would be shipped and billed. The Superdome project would remain unchanged. Endura would pay Guinchará a commission of 5% on *295 all shipments of Endura into Hi-Tech’s territory in designated states until December 31, 1998. In the event that Guinehard would initiate selling activity in the Hi-Tech territory on rubber products that competed with Endura, points # 4 and # 5 would automatically become null and void (relating to commissions on sales and specifications). Guinehard of Hi-Tech did not sign this letter, and was not required to return any signed agreement to this letter to Biltrite.
Guinehard testified that he felt he had been handed an ultimatum and had no choice in the matter. He testified that after he was no longer allowed to distribute or sell Endu-ra, his business suffered substantial losses and he was forced to terminate his sales relationship with William Bath. As a result, Hi-Tech did not pay Bath his entire commission for the Superdome job as previously agreed upon (he was paid approximately $27,000.00 of around $49,000.00 allegedly due). Ultimately, Bath filed suit against Hi-Tech and Biltrite on May 28, 1993, for the unpaid commission on the Superdome project. Bath alleged that Hi-Tech agreed to pay his commission, but later refused to hon- or its commitment. Bath alleged that Bil-trite guaranteed that |6it would protect his interests in the commission and would pay him if Hi-Tech did not.
Biltrite answered Bath’s petition, asserting a claim for indemnity and contribution against Hi-Tech.
On August 20, 1993, Hi-Tech answered Bath’s petition and reconvened against Bath, alleging that he engaged in a list of wrongful conduct during his tenure as Hi-Tech’s sales representative. Hi-Tech also asserted a cross claim against Biltrite, alleging that Bil-trite breached Paragraph 8 of the distributorship agreement by failing to give at least six (6) months advance notice of the termination of the agreement.
The case proceeded to a bench trial on September 16-19, 1996. On the fourth day of trial, Bath settled his claim in exchange for a $40,000 payment from Biltrite. Biltrite reiterated its intention to seek indemnity from Hi-Tech.
On December 16,1996, the trial court rendered judgment in favor of Hi-Tech. In one page of written reasons, the court found that Biltrite had breached paragraph 8 of the distributorship agreement in connection with the termination of that agreement. The court awarded Hi-Tech the following damages: $168,540 for six months lost profits on Biltrite sales; $25,949.70 balance , due on the Superdome project; $3,790.91 balance due on Federal Reserve bank; less a credit for payment to Bath of $20,952.87, for a total damage award of $167,327.74.
Biltrite moved for a new trial, which was denied without hearing or reasons on December 23, 1996. Biltrite appealed suspensively from the trial court’s judgment. Hi-Tech answered the appeal, requesting that damages be raised to $1,201,034.80 plus legal interest from date of judicial demand and all costs. The answer further asked for damages against Biltrite for frivolous appeal, and all legal, equitable, and general relief to which it is entitled.
ROn appeal, Biltrite makes the following assignments of error. First, the trial court clearly erred in finding that the parties did not consensually terminate their distributorship agreement. Second, Hi-Tech is es-topped to deny that the parties terminated the distributorship agreement by consent, because they accepted Biltrite’s confirming letters and led Biltrite to believe that the letters accurately stated the terms of the parties’ new relationship. Third, by its conduct, Hi-Tech waived any right to complain about the absence of a formal termination letter signed by both parties.
Regarding the damage award, Biltrite argues that the distributorship agreement prohibits damages for lost profits. Second, the court’s award of lost profits is speculative and grossly excessive. Third, Biltrite is entitled to full credit for the commission it paid to Mr. Bath on Hi-Tech’s behalf.
ANALYSIS
The first thing we note is that the parties agreed that this Agreement shall be construed and interpreted under the laws of the Commonwealth of Massachusetts. We will breakdown our analysis into the areas of *296 consensual alteration, and estoppel and waiver.
Consensual Alteration
Biltrite argues that the trial court erred in not finding that the parties consensually changed their agreement. Specifically, it argues that Hi-Tech received two confirmation letters following the February 19 meeting, and acted in accordance with the terms in the letters. By those actions, Bil-trite argues, Hi-Tech manifested its belief that the new relationship was valid.
| sGuinchard testified that he did not agree to the February 19 “modification” or termination of the distributorship agreement, but felt that he had been handed an ultimatum by Biltrite that he had no choice but to accept. Biltrite characterizes its February 22 letter to Guinchard as a memorialization of their new agreement, yet Guinchard testified that he did not agree to the change in terms, but felt he had no choice in the matter.
Biltrite cites First Pennsylvania Mortgage and Trust v. Dorchester Savings Bank, 395 Mass. 614, 481 N.E.2d 1132 (1985) for the principal that parties may alter a written agreement in a subsequent oral conversation and no more, despite the agreement containing a provision that all alterations shall be in writing. We find that case distinguishable. The change in that case consisted of the increase of a loan amount to finance construction of a condominium development. The plaintiff, First Pennsylvania Mortgage and Trust (FPMT), through its officer, agreed to advance the increased loan amount. He participated fully in negotiations and was an equal partner at the bargaining table. Moreover, the trial court found as a fact in First Pennsylvania Mortgage and Trust that FPMT’s officer Ware had participated in the discussions and had agreed to the increased loan amount. That appellate opinion shows that the evidence of Ware’s agreement was substantial, including actions, statements to others, and a written memorandum.
In the instant case, the trial judge made no such factual finding. Guinchard was not an equal partner with Biltrite. Biltrite decided to terminate its relationship with Hi-Tech, summoned Guinchard to this meeting without telling him ahead of time the subject matter, and dictated to Guinchard the terms of a termination, not merely the change in one of the terms of the agreement. Biltrite was a large corporation that sold bits product across the country; Hi-Tech was a smaller regional distributor, a majority of whose business consisted primarily of selling Endu-ra, according to testimony.
Biltrite argues that the legal requisites for finding economic duress have not been satisfied. A party claiming duress can prevail by showing: 1) that he involuntarily accepted the terms of another; 2) that circumstances permitted no other alternative; 3) that said circumstances were the result of coercive acts of the opposite party. Vasapolli v. Rostoff, 39 F.3d 27 (1st Cir.1994). The testimony of all witnesses, considered as a whole and as outlined above, supports each element and the finding that Hi-Tech did not voluntarily accept Biltrite’s February 22 terms.
Moreover, Biltrite asks us to overlook the trial court’s statement of law that “It is a settled principal that the mode of performance required by a written contract may be varied by a subsequent oral agreement based upon a valid consideration.” 481 N.E.2d at 1139. We see no valid consideration that Hi-Tech received. Hi-Tech’s distributorship agreement with Biltrite was terminated by the latter’s unilateral action, and they received much less than they would have had the agreement been terminated under the agreement. Paragraph 8(a) suggests that the six month “at will” termination would have had the effect of continuing regular business from the date of notice to the date of termination six months later, which would include the right to continue selling the product and receiving full commissions. However, Hi-Tech was immediately prohibited from selling any Endura flooring, and was to receive only 5% of the profits of any Endura sales by the new distributor within the former territory.[1]
*297 lioWe do not find that the February 22 letter constitutes a new “agreement” between the parties, nor a consensual alteration of the original distributorship agreement. The first paragraph of the letter clearly establishes that the relationship is terminated, as of February 19, 1998. A termination is the end of a relationship, not a “new” one. The February 22 letter does not establish “new terms” of an agreement, it establishes the terms of the termination. Contrary to Biltrite’s argument in brief, the February 22 letter does not modify the notice provisions of the original agreement. That letter contains no mention of notice provisions.
We note that Biltrite’s witnesses testified that it decided to terminate its relationship with Hi-Tech for Hi-Tech’s alleged breach of the original agreement in not keeping its account current with Biltrite. This testimony is inapposite to Biltrite’s position on appeal that the terms of the original agreement had been waived by Hi-Tech. If Biltrite felt that Hi-Tech was in breach of its obligation to maintain a current account with Biltrite, the agreement provided a way for Biltrite to terminate Hi-Tech for cause. This procedure, found in Paragraph 8(b), provided for written notice to Hi-Tech of the specific breach and a 60 day time period to correct it. Hi-Tech was afforded no such opportunity. Biltrite could have terminated the agreement immediately, as the February 22 letter did, had Hi-Tech been insolvent (Paragraph 8(c)), but there is no evidence in the record that Hi-Tech was insolvent. The record is clear that Biltrite simply no longer wanted to do business with Guinchard, and dictated the terms of the February termination to Guinchard.
Biltrite witness Jake Hill, the President of the Endura Flooring Division, testified that he had received customer complaints about Guinehard’s personality. He also testified that he found Hi-Tech severely lacking in its credit extensions, its stocking of merchandise, and sales coverage. Yet, the testimony is clear that Hi-Tech luwas never notified of those problems and given an opportunity, under paragraph 8(b) to rectify the problems.
Guinchard testified that with the termination on February 19, his business was substantially ruined, and that he had no choice but to seek out new rubber flooring lines to represent. Biltrite argues that Guinchard’s phone call regarding one of its other current lines of rubber flooring (recorded in Biltrite’s March 2, 1993 letter to Guinchard) shows that Guinchard agreed to the new “agreement.” We do not agree. Biltrite also claims in brief that neither Hi-Tech nor Guinchard ever explained the months of acquiescence between March and July, 1993; to the contrary, Guinchard testified that because Biltrite terminated the agreement, he didn’t consider it necessary to talk to them about his business.
We find the evidence and testimony shows that Hi-Tech did not consensually alter its agreement with Biltrite.
Estoppel and Waiver
The doctrine of estoppel is stated in Looney v. Trimount Theatres, Inc., 282 Mass. 275, 184 N.E. 683 (1933) as follows:
In order to work an estoppel it must appear that one has been induced by the conduct of another to do something different from what otherwise would have been done and which has resulted to his harm and that the other knew or had reasonable cause to know that such consequence might follow. But the doctrine of estoppel is not applied except when to refuse it would be inequitable. ‘The law does not regard estoppels with favor, nor extend them beyond the requirement of the transactions in which they originate.’
That court went on to state:
... the test appears to be whether in all the circumstances of the case conscience and duty of honest dealing should deny one the right to repudiate the consequences of his representations or conduct; whether the author of a proximate cause may justly repudiate its natural and reasonably anticipated effect; fraud, in the sense of a court of equity, Improperly including all acts, omissions and concealments which involve á breach of legal or equitable duty, trust or confidence, justly reposed, and are injuri *298 ous to another, or by which an undue and unconscientious advantage is taken of another.
Biltrite’s core argument on appeal is that Hi-Tech is estopped from claiming a breach of Paragraph 8 in the distributorship agreement, when it agreed on a previous occasion in 1990, without the required mutually signed writing, to modify its distribution territory. Biltrite argues that since Hi-Tech once agreed to a change in the agreement without the required writing, it is now es-topped protesting a second “change” accomplished again without the mutually signed instrument.
Considering the above explanation of es-toppel, is it quite clear that use of this doctrine is misplaced in this case. When Hi-Tech acquiesced to the territory change in 1990, it did not thereby agree to disregard the writing requirement for future changes. Hi-Tech’s agreement to this one change without the writing requirement did not constitute a waiver to all of the other terms in the contract, including the provision on termination procedures.
The original agreement established Hi-Tech’s territory as Arkansas, Louisiana, Mississippi, and Tennessee. The new territory, as noted in the 1990 letter, consisted of Arkansas, Louisiana, Mississippi, and seven western counties of Tennessee. The only term that the 1990 letter changed was the territory; Hi-Tech lost a few counties in Tennessee. Following Looney’s pronouncement that estoppels are not to be extended beyond the requirement of the transactions in which they originate, we find that the parties’ agreement to change Hi-Tech’s territory did not operate to nullify the writing requirement regarding future changes. Hi-Tech is not estopped from suing Biltrite for the latter’s breach of contract simply because the parties earlier agreed to change one term without the required formalities. Under the legal authorities citedJjjby Biltrite, an estop-pel would be appropriate if Hi-Tech were now suing Biltrite for the change of territory.
It is quite clear to this court that Biltrite is the party who took advantage of Hi-Tech, not the other way around. The parties were clearly not on equal footing. Biltrite was in a superior position, being the manufacturer of the product that formed a little over half of Hi-Tech’s business. Hi-Tech had not been placed on any kind of official notice that its performance was lacking (as per ¶ 8(b) of the distributorship agreement). Biltrite determined that it wanted to end its relationship with Hi-Tech, had already found the new distributor it wanted (Transtar), and informed Guinehard of these terms at a meeting, not letting Guinehard know of the purpose of the meeting and not allowing him to prepare.
Biltrite also argues that Hi-Tech complied with the February 22, 1993 terms until July, 1993, when Biltrite again “terminated” their relationship and the terms of the February 22 letter, upon learning that Guinehard was marketing a competing product to Endura. This “compliance” between March and July constitutes, they argue, a waiver of the terms of the original distributorship agreement. As evidence of the waiver, they cite Guinch-ard’s inquiry into whether another brand of rubber flooring he carried would violate the termination terms in the February 22 letter. Biltrite now argues that Guinchard’s inquiry is evidence of his ratification and agreement with the terms of February 22, so that he cannot now sue for the breach of the distributorship agreement.
We note that the distributorship agreement contains the following provision in paragraph 12: “The failure of BILTRITE to enforce at any time any of the provisions, rights or terms hereof shall not be considered or be deemed to be a waiver of such provisions, rights or terms.” Thus, the one time act of changing the territory by oral | i4agreement in 1990 cannot now be construed as a waiver of the written modification requirement. The failure of Hi-Tech to immediately pursue its action for damages for breach of the distributorship agreement did not waive its rights.
Damages
Biltrite argues on appeal that the distributorship agreement, paragraph 8(e), disallows either party any damages from the *299 termination of the agreement.[2] Biltrite argues that limitation of liability clauses are enforceable, and thus the trial court erred in awarding Hi-Tech damages for lost profits. Biltrite cites a number of cases for this idea.[3] Whereas we agree that a limitation of liability clause in a contract is enforceable under Massachusetts law, we do not find this clause enforceable under the factual circumstances presented in this case.
Read as whole with the entire paragraph 8, we find that paragraph 8(e) disallows damage claims in the event the agreement was terminated according to the different methods contained in that paragraph. We do not find that Hi-Tech is without remedy for the breach of the distributorship agreement. Nowhere in the agreement do we find that the parties contracted away their right to damages for the breach of the agreement. Hi-Tech seeks damages for Biltrite’s breach of the agreement, in terminating the relationship in a way not agreed to in the contract. We agree that had Biltrite correctly invoked and utilized paragraphs 8(a), (b), or (c), Hi-Tech would have no claim for damages. However, Biltrite cavalierly disregarded its disagreement because it wanted to “change” its relationship with Hi-Tech from distributorship to manufacturer’s representative, an act not contemplated in the original distribution agreement.
L.A.R. Serv. Center, Inc. v. Whirlpool Corp., 896 F.Supp. 48 (D.Mass.1995), cited by Biltrite, can be factually distinguished. In that ease, the parties entered into the newest of a series of agreements that spanned several years. In the new agreement, LAR agreed not to repair appliances that it had not sold. However, LAR continued this practice, despite the agreement not to. When Whirlpool learned of the violation, it terminated its contract with LAR, a “measure sanctioned by the parties’ agreement.” Id. at 51. We note that LAR alleged three counts of contractual breach by Whirlpool. The court found that for the other two counts, which LAR alleged various breaches of the previous year’s contract by Whirlpool, the limitation of liability clause did not apply, because the alleged breaches were not “termination or cancellation,” the only act to which the limitation of liability clause applied. Similarly, we find that Biltrite’s method of termination was not “sanctioned” by the parties’ agreement, and thus that provision of paragraph 8(e) does not apply to.
Hi-Tech has answered this appeal and argues that the damages should be increased.
Under Massachusetts law, damages for lost profits are recoverable only when proof is made with sufficient certainty. Augat, Inc. v. Aegis, Inc., 417 Mass. 484, 631 N.E.2d 995 (1994). Biltrite argues that the damage award is speculative and grossly excessive. In this section, Biltrite argues that all of Hi-Tech’s problems stem from its consensual termination of the distributorship agreement, which we have already determined was not consensual. (At trial, Biltrite argued vigorously that the agreement was not terminated, but only altered.) Biltrite argues that at Hi-Tech’s | ^stated profit margin of 31.69%, Hi-Tech was attributed with over $1,000,000 in gross sales per year, which the record does not support. Biltrite argues that Hi-Tech’s gross sales of Endura for 1992 amounted to just over $133,000. Bil-trite claims that the court must have used in its calculation the Superdome project, which Guinchard admitted was the “biggest single job that was ever sold in the industry on one order ...”
Even though Hi-Tech had not had a previous sale of the size of the Superdome project, the fact remains that this sale did occur and it was attributable to years of hard work by Hi-Tech. The Superdome project was used by Biltrite as an important marketing tool in *300 its brochures to develop future sales of this size. Biltrite reaped substantial benefits from the Dome project, due substantially to Hi-Tech’s efforts to market Endura to the Dome officials. To not include this project in a lost profit calculation would be inequitable to Hi-Tech. We also note that Biltrite had the opportunity to present its own expert witness to refute the theories and calculations of Hi-Tech’s expert CPA, and did not do so. We decline to disturb the trial judge’s calculation of lost profits due to Hi-Tech.
We decline to disturb the trial court’s credit to Biltrite for its settlement with William Bath. The record shows that Biltrite and Bath arrived at this settlement without the participation of Hi-Tech, thus depriving Hi-Tech of any input into the amount agreed upon. Further, the record testimony shows that Biltrite made promises to Bath to protect his commissions and to pay him if necessary. Biltrite voluntarily obligated itself for this amount to Bath, without entering into any agreement with Hi-Tech regarding indemnity.
The record supports the trial courts determination of damages and the corresponding set-off for Bath’s commission.
|i7Hi-Tech seeks damages for frivolous appeal. La.C.C.P. art. 2164 provides for the imposition of damages for frivolous appeals. This provision is penal in nature and must be strictly construed. Damages will not be awarded unless it appears that the appeal was taken solely for the purpose of delay, serious legal questions are not raised, or that the appealing counsel does not seriously believe in the position he advocates. Kambur v. Kambur, 94-775 (La.App. 5 Cir. 3/1/95), 652 So.2d 99. We do not find this appeal frivolous, and therefore do not award damages.
Finding no manifest error, we affirm the trial court’s judgment and assess costs of appeal to appellant.
AFFIRMED

. The testimony of Endura's witnesses established that Biltrite did not honor this 5% provision. Hi-Tech never received this 5%, despite Biltrite's witnesses confirming that the new dis *297 tributor did indeed sell Endura in the territory during May and June of 1993.

. (e) Except as expressly provided herein neither party shall incur any liability to the other upon or arising from the termination of this Agreement. DISTRIBUTOR specifically acknowledges and agrees that it shall have no claim for loss of business, loss of goodwill or any other loss by reason thereof.

. L.A.R. Serv. Center, Inc. v. Whirlpool Corp., 896 F.Supp. 48 (D.Mass.1995); Deerskin Trading Post, Inc. v. Spencer Press, Inc., 398 Mass. 118, 495 N.E.2d 303 (1986); Chestnut Hill Dev. Corp. v. Otis Elevator Co., 653 F.Supp. 927 (D.Mass.1987).