## COMMONWEALTH vs. JAMES M. KATER.

Middlesex. May 5, 2000. - August 30, 2000.

Present: MARSHALL, C.J., ABRAMS, GREANEY, & SPINA, JJ.

*Homicide. Kidnapping. Practice, Criminal,* Capital case, Required finding, Grand jury proceedings, Voir dire, Prior conviction, Preservation of evidence, Argument by prosecutor. *Evidence,* Hypnotically aided testimony, Grand jury proceedings, Prior conviction. *Grand Jury.*

Evidence at the trial of an indictment for murder in the first degree was sufficient to permit the jury to find the defendant guilty on a theory of deliberate premeditation or extreme atrocity or cruelty. [410-411]

A criminal defendant waived an issue, on appeal of the case after his fourth trial, with respect to the integrity of the grand jury, where it could have been raised in the first appeal. [411]

Reviewing under G. L. c. 278, § 33E, the claim of a defendant convicted of murder in the first degree, this court concluded that the integrity of the grand jury in returning the murder indictment was not impaired. [411-412]

At a murder trial, the judge did not abuse his discretion in denying the defendant's request for individual voir dire of the jurors regarding prospective evidence of the defendant's having committed a prior similar crime. [412-414]

At a murder trial, there was no error in the judge's admission of evidence of the defendant's conviction, after a plea of guilty, to a similar crime or of evidence regarding the prior bad acts, relevant as tending to prove that the defendant was the person who committed the crime charged. [414-416]

At the trial of a murder indictment, the judge correctly permitted previously hypnotized witnesses to testify only to facts that were documented in the record before their hypnosis procedures were performed. [416-417]

A Superior Court judge correctly concluded that, in a murder case, the Commonwealth had no duty to preserve or produce items that were not in the Commonwealth's custody or control, or that were not material to the murder case and thus not exculpatory; nor, for the same reasons, had the Commonwealth acted in bad faith in failing to disclose photographic negatives of pictures of the items; the defendant was not entitled to dismissal of the indictments against him. [417-420]

The defendant in a murder case did not demonstrate that the asserted cumulative loss or destruction of certain items of evidence by the Commonwealth denied him the right to a fair trial warranting the dismissal of the indictments against him, or that the cumulative effect of the lost evidence created a serious likelihood of a miscarriage of justice. [420-422]

At a murder trial, the trial judge did not err in denying the defendant's motion for a mistrial based on the prosecutor's closing argument, where the judge

concluded that the closing was within the bounds of fair argument; further, any prejudice that might have been caused by the prosecutor's single misstatement of the evidence was specifically and appropriately eliminated by the judge's curative instruction, and there was no merit to the defendant's claim that the prosecutor impermissibly argued the defendant's propensity to commit the crime. [422-424]

INDICTMENTS found and returned in the Superior Court Department on November 28, 1978.

Following review by this court, 421 Mass. 1008 (1995), the cases were tried before *Peter M. Lauriat, J.*

*Joseph F. Krowski (Michael A. Bergeron* with him) for the defendant.

*Elspeth B. Cypher,* Assistant District Attorney, for the Commonwealth.

SPINA, J. This is the seventh appeal in the Commonwealth's prosecution of James M. Kater (Kater) for the kidnapping and murder of Mary Lou Arruda, which began with his indictment on November 28, 1978. In 1979, a jury found him guilty of kidnapping and murder in the first degree. We reversed that conviction because certain testimony that had been or might have been hypnotically aided was erroneously admitted. *Commonwealth* v. *Kater,* 388 Mass. 519 (1983) *(Kater I).* Two years later, prior to a retrial, we reversed an order denying the defendant's motion to suppress hypnotically aided testimony and directed the judge to hold a hearing and determine by a preponderance of the evidence which testimony of certain prosecution witnesses was based on prehypnotic memory and therefore admissible. *Commonwealth* v. *Kater,* 394 Mass. 531 (1985) *(Kater II).* In 1986, Kater was convicted again. We reversed the second conviction because, again, hypnotically aided testimony was erroneously admitted. *Commonwealth* v. *Kater,* 409 Mass. 433 (1991) *(Kater III).* Prior to the defendant's third trial, we affirmed an order allowing a portion of the defendant's motion to suppress expected testimony which the Commonwealth failed to show by a preponderance of the evidence was based on the witnesses' prehypnotic memory. *Commonwealth* v. *Kater,* 412 Mass. 800 (1992) *(Kater IV).* A third trial commenced in October, 1992, and on December 24, 1992, the trial judge declared a mistrial. One and one-half years later, Kater moved to dismiss the indictments, arguing that

principles of double jeopardy barred a fourth trial. In July, 1994, a trial judge denied the motion, and the defendant sought interlocutory relief from a single justice of this court under G. L. c. 211, § 3. The single justice reported the case to the full court. We held that double jeopardy principles did not bar another retrial because there had been sufficient evidence presented at trial to convict Kater, notwithstanding the fact that the trial judge erred in admitting certain evidence and without it the evidence would have been insufficient to support a conviction. *Kater* v. *Commonwealth*, 421 Mass. 17, 18 (1995) (*Kater V*). *Lockhart* v. *Nelson*, 488 U.S. 33, 40-41 (1988). Cf. *Berry* v. *Commonwealth*, 393 Mass. 793, 798 (1985). In preparation for a fourth trial, the Commonwealth filed a motion to admit evidence of the defendant's prior bad acts. The trial judge allowed the motion, and the defendant sought interlocutory relief under G. L. c. 211, § 3. A single justice of this court denied the petition, on the ground that interlocutory review was not appropriate. We affirmed. *Kater* v. *Commonwealth*, 421 Mass. 1008 (1995) (*Kater VI*). A fourth trial commenced on October 31, 1996, and on December 23, 1996, the defendant was found guilty of kidnapping and murder in the first degree.

On appeal, the defendant argues that (1) the integrity of the grand jury was so seriously impaired that the indictments should have been dismissed; (2) the trial judge abused his discretion in denying the defendant's requests for an individual voir dire of each juror as to the prior bad act evidence; (3) the trial judge erred in allowing the Commonwealth to introduce evidence of the defendant's prior bad acts; (4) he was denied his right to due process of law and his right to effectively cross-examine witnesses through the use of previously hypnotized witnesses; (5) the Commonwealth's loss or destruction of evidence violated his right to due process under both State and Federal constitutional law; (6) the judge erred in denying his motion for required findings of not guilty; and (7) the prosecutor's arguments were highly improper and prejudicial to the defendant. We affirm the convictions.

1. *Background facts.* The jury at Kater's fourth trial could have found the following facts. On September 8, 1978, at about 4 P.M., fifteen year old Mary Lou Arruda disappeared while riding her bicycle near her home in Raynham. Her bicycle was found at approximately 4:30 P.M. that same day by the side of a road. Next to it was an automobile tire track with an accelera-

tion mark. The track characteristics suggested that the tire had an abnormal tread wear pattern. A Benson & Hedges brand cigarette was found nearby in the middle of the road. Two months later, on November 11, 1978, Arruda's decomposed, fully-clothed body was found tied to a tree in Freetown State Forest. The cause of her death was strangulation by ligature or positional asphyxia. A pathologist testified that Arruda had been alive and in a standing position when she was tied to the tree, but that once she became unconscious, the weight of her head against the ligature around her neck caused her to suffocate. Arruda most likely died the same day she disappeared.

Around the time Arruda disappeared, five individuals in her neighborhood noticed an unfamiliar, bright green automobile with a black or silver stripe and black lettering speeding through the area. One of them described the driver as a white male with dark, curly hair and dark-rimmed glasses. Another said that she saw someone else in the automobile with the driver, but could not identify who it was.

The boy who found Arruda's bicycle returned it to Arruda's house at about 5 P.M. Shortly thereafter, Arruda's mother called the police. For the next three days, police, civilians, and canines searched the area where Arruda had last been seen. On September 9, 1978, police developed photographs of the automobile tire tracks found near the bicycle. On September 10, 1978, they published a wanted poster containing a composite likeness of the driver of the bright green automobile. Three days later, the police received information on Kater, including a photograph of him.

On September 19, 1978, Kater, accompanied by his attorney and his wife, met with police at the Raynham police station. The police noted that Kater's appearance was consistent with the composite created earlier that week, and that he smoked Benson & Hedges brand cigarettes. Kater gave the police permission to search his automobile, a bright green 1976 Opel with a black racing stripe. The right front tire tread had similarly unusual characteristics as the tire track found near Arruda's bicycle. Inside the car, they saw wedding gifts,[1] two cartons of Benson & Hedges cigarettes, and two pairs of dark-rimmed glasses in the glove compartment. In the trunk, under some luggage, they saw September 10 editions of the Boston Globe and

---

[1]Kater married his eighteen year old fiancée, now his ex-wife, on September 9, 1978, the day after Arruda disappeared.

the Boston Herald American newspapers, each open to articles about the disappearance of Mary Lou Arruda. The police photographed Kater and the tires on his car.

After receiving the Miranda warnings, Kater also gave the police a statement as to his whereabouts on September 8, 1978. During the period between 4 P.M. and 6 P.M. that day, Kater claimed that he had picked up his clothes from the cleaners at 3:45 P.M., dropped off his clothes at home, stopped at the local Friendly's restaurant he regularly patronized at 4:15 P.M. for a sandwich and coffee, shopped at a local Bradlees around 5:45 P.M. to purchase a gift for his fiancée, washed his car at a nearby carwash, paid a short visit to the donut shop where he worked at 6:15 P.M., and then went home. In checking his alibi, police learned that Kater had not in fact gone to Friendly's that day, could not have purchased anything at the Bradlees before 6:40 P.M. that evening, and most likely paid a short visit to his workplace at approximately 7 P.M. instead of 6:15 P.M. Kater also missed a 5:30 P.M. appointment that day, and was seen by four other witnesses driving his bright green Opel at approximately 4:30 P.M. in the immediate vicinity of Freetown State Forest, the place where Mary Lou Arruda's body was found.

At trial, five witnesses were shown a photograph of Kater's green Opel as it appeared in 1978 as well as the actual automobile, seized by the police pursuant to a warrant, and stored in a court house basement until the time of the trial. Each witness testified that the car in the photograph and the car in the court house basement were similar in color, size, and markings to the bright green car they saw in their neighborhood and in the vicinity of Freetown State Forest on September 8, 1978, around the time Arruda disappeared.

A mechanic who had repaired Kater's car on September 20, 1978, testified that the inner wheel bearings of his right front tire were completely disintegrated, a condition most likely caused by "over-torquing."[2] Based on the level of wheel bearing deterioration, he estimated that the car had been driven approximately 5,000 miles in the over-torqued condition. The ef-

---

[2] "Torque" in this context is the twisting or turning force required to turn a nut or a bolt. When a wheel bearing assembly has been "over-torqued," too much pressure has been put on the nut or bolt holding the wheel assembly together, and over time the lubrication between the bearings is forced out, causing metal to metal contact and deterioration.

fect on a tire of driving that many miles in such a condition would be to cause abnormal wear on the tread, a scalloping or scuffing and indentation of the tread, as was found on Kater's tire. In normal circumstances, a tire tread would not have been worn in the manner that the tire on Kater's car had been. After examining the actual tire and the photographs and impressions of the tire tread track left next to Arruda's bicycle, an agent with the Federal Bureau of Investigation (FBI) testified that the tread design, tread dimension, and tread wear pattern of the tire from Kater's car were all consistent with the photographs and impressions taken of the tire tracks found next to Arruda's bicycle on September 8, 1978.

Kater had previously committed a crime similar in significant detail to the one inferably perpetrated against Mary Lou Arruda. On February 6, 1969, Kater pled guilty to indictments of assault with intent to rape, assault and battery by means of a dangerous weapon, and kidnapping. All of the indictments were related to the 1968 abduction and attacks on Jacalyn Bussiere. On June 22, 1968, between 1:30 P.M. and 2:30 P.M., thirteen year old Jacalyn Bussiere was walking her bicycle home on a quiet street in North Andover when she noticed that a small, unfamiliar light blue automobile had stopped in front of her. It was the same car that had passed by her several times earlier that afternoon. The driver, James M. Kater,[3] was standing in the middle of the street. The driver's side door was open and the engine was running. Kater stood facing her and asked for directions to a neighbor's house. As Kater walked toward her and Bussiere toward him, he seemed friendly. But when she answered him by turning and pointing to the place he purportedly wanted to go, he covered her mouth and nose with his hand. As she tried to get away, she dropped her bicycle and saw that Kater was holding an iron bar. Kater then forced a very frightened Bussiere into the car on the floor underneath the dashboard. He immediately got in the driver's seat, put the car in reverse, backed down the street, and turned around at an intersection. Driving very fast, they traveled for about thirty minutes, the last few of which were along a wooded path. Kater then stopped the car, pulled Bussiere out, and walked her further into the woods. He hit her on the back of the head with the iron bar while forcing her to kneel at a stream. As Kater tried to force Bussiere's face into the water, she resisted and grabbed

---

[3]Bussiere identified Kater as the man who had abducted and attacked her.

Kater's glasses and flung them away. As he retrieved them, she fled but did not get far before he grabbed her again. Kater then forced her back into the car and drove deeper into the woods. He stopped again, took Bussiere out of the car, walked further into the woods, and forced her to stand against a tree. Kater used strips from a torn bedspread to tie Bussiere's hands, ankles, and torso against the tree. After twenty minutes of pacing back and forth, Kater came up behind Bussiere and pulled the last strip of bedspread very tight against her neck and then strangled her with his hands. Bussiere lost consciousness. When she regained consciousness, she found herself alone, slumped over, and bound to the tree. She managed to untie herself and ran until she found help. From there she was taken home, to a hospital, and then to the police department.

Kater testified on his own behalf. He acknowledged pleading guilty to the abduction and assault of Jacalyn Bussiere in 1968, and stated that he had been in the process of rebuilding his life since January, 1976. Kater denied having any responsibility for the disappearance and death of Mary Lou Arruda.

2. *Required findings of not guilty.* Kater argues that the judge erred in denying his motion for required findings of not guilty. Specifically, he claims that the Commonwealth's forensic evidence failed to establish a link between Kater, his car, and Arruda, and that his alibi established that he could not have abducted Arruda. When considering a motion for a required finding of not guilty, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" (emphasis in original). *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting *Jackson* v. *Virginia*, 443 U.S. 307, 318, 319 (1979). We conclude that there was sufficient evidence to permit the jury to find Kater guilty of murder in the first degree under either of two theories.[4] The evidence strongly supports a finding that Kater killed Arruda. As for premeditation, there was evidence to permit the jury to find that Kater went looking for someone to kill. He waited until Arruda was alone on the street before he

---

[4]To prove first degree murder, the Commonwealth must show that the defendant (1) committed an unlawful killing, (2) with malice aforethought, and (3) deliberate premeditation or extreme atrocity or cruelty. *Commonwealth* v. *Whitman*, 430 Mass. 746, 751 (2000). See *Commonwealth* v. *Judge*, 420 Mass. 433, 437 (1995).

forced her into his car, and he had ample time to reflect on his conduct as he drove to the woods, tied Arruda to a tree, strangled her, and left her to die. Such evidence may support a conviction of murder in the first degree on a theory of deliberate premeditation. See *Commonwealth* v. *Skinner*, 408 Mass. 88, 93 (1990), quoting *Commonwealth* v. *Tucker*, 189 Mass. 457, 494-495 (1905) (deliberate premeditation may be a matter of "days, hours, or even seconds"). Second, there was evidence to permit the jury to infer that Kater was indifferent to Arruda's suffering. Mary Lou Arruda, a fifteen year old cheerleader, was alive while Kater tied her to a tree from head to toe. She was conscious before he tied twine around her neck and caused her death by suffocation. Such evidence may support a conviction of murder in the first degree on a theory of extreme atrocity or cruelty. See *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227-228 (1983). There was no error.

3. *Grand jury impairment.* Kater argues that the integrity of the grand jury proceedings was so seriously impaired that the indictments should have been dismissed. He contends that the indictments were based on unreliable, hypnotically aided testimony along with distorted, misleading, selectively edited hearsay and highly prejudicial evidence of his prior criminal record. He also claims that highly exculpatory evidence was not presented. We addressed a nearly identical argument by the defendant in *Kater III*, in which he argued that "the Commonwealth so impaired the integrity of the grand jury that the indictment must be dismissed." *Commonwealth* v. *Kater*, 409 Mass. 433, 445 (1991). In that case we said:

> "the issue here arises for the first time on a second direct review. Nevertheless, the logic of our rule that issues available but not argued in the first appeal are waived on any subsequent appeal applies in this situation. Any objections to indictments based on defects in the grand jury proceeding thus have been waived on this appeal as well as on the next retrial."

*Id.* The issue is still deemed waived.

Considering the question pursuant to our responsibilities under G. L. c. 278, § 33E, however, we conclude that the integrity of the grand jury was not impaired. Ordinarily, we do not inquire into the competency or sufficiency of evidence

presented to the grand jury. *Commonwealth* v. *Coonan*, 428 Mass. 823, 825 (1999). "[A]t the very least the grand jury must hear sufficient evidence to establish the identity of the accused . . . and probable cause to arrest him." *Id.*, quoting *Commonwealth* v. *McCarthy*, 385 Mass. 160, 163 (1982). Here, the grand jury heard testimony from a witness who identified Kater as a driver of the bright green car speeding through Arruda's neighborhood on the afternoon of her disappearance. They also heard evidence that contradicted Kater's alibi and placed his car at the scene of Arruda's abduction and near Freetown State Forest, as well as evidence of his prior similar crime. The admissible evidence presented to the grand jury was sufficient to indict Kater. The use of hearsay testimony is of no consequence because an indictment may be based, in whole or in part, on hearsay, see *Commonwealth* v. *Dilone*, 385 Mass. 281 (1982); *Commonwealth* v. *St. Pierre*, 377 Mass. 650 (1979); Mass. R. Crim. P. 4 (c), 378 Mass. 849 (1979), despite our preference for the use of direct testimony. Although some testimony was hypnotically aided and later deemed by this court to be unreliable for use at trial, an indictment need not be dismissed because the grand jury may have considered evidence that was later suppressed. *Commonwealth* v. *Manning*, 44 Mass. App. Ct. 695, 702-703 (1998). Kater also has failed to make a substantial preliminary showing that the Commonwealth knowingly presented false testimony to the grand jury as might warrant dismissal of the indictments. See *Commonwealth* v. *Salman*, 387 Mass. 160, 166-167 (1982). The integrity of the grand jury proceedings was not impaired.

4. *Voir dire*. Kater argues that the judge abused his discretion in denying his requests for an individual voir dire of the jurors regarding the prior bad act evidence. Prior to trial, Kater filed a motion to conduct an individual voir dire of prospective jurors to determine whether his previous, similar offenses would so influence them that they would be unable to follow the judge's instructions regarding proper use of the information. Initially, the judge allowed the request. Five prospective jurors were asked, over the Commonwealth's objection, whether they believed that a person who previously has been convicted of a serious offense should ever be released into the community.[5] The judge thereafter concluded that the question was misleading

---

[5]The potential jurors were told: "In 1968, the defendant James Kater pled guilty to and was sentenced on charges of kidnapping, attempted rape and as-

and decided that he would no longer ask it. He continued, however, to ask prospective jurors whether they would be able to presume Kater innocent of the present charges against him if they heard evidence that he had committed prior similar crimes.[6] The next day, the judge again changed his mind and stated that he would not use any of the questions concerning the jurors' ability to follow instructions on the use of prior similar crime evidence. He reasoned that, if evidence of other crimes were admitted, it would not be extraneous within the meaning of G. L. c. 234, § 28, and voir dire would not be authorized. Also, if the evidence were ultimately not admitted at trial, the questions would have then contaminated the jury. We agree.

General Laws c. 234, § 28, provides that a trial judge must, for the purpose of determining whether a juror stands indifferent in a case, conduct an individual voir dire of each prospective juror if it appears that a substantial risk exists that an extraneous issue might affect the outcome of the case. *Commonwealth* v. *Ashman*, 430 Mass. 736, 739 (2000). See *Commonwealth* v. *LaFaille*, 430 Mass. 44 (1999); *Commonwealth* v. *Flebotte*, 417 Mass. 348, 354 (1994). Whether to conduct such an inquiry is ordinarily in the sound discretion of the trial judge, *Commonwealth* v. *Federici*, 427 Mass. 740, 747 (1998), but we have required examination of a prospective juror's attitudes when cases involve certain highly charged issues, none of which are at issue in this case. Cf. *Commonwealth* v. *Seguin*, 421 Mass. 243, 247 (1995), cert. denied, 516 U.S. 1180 (1996) (insanity defense); *Commonwealth* v. *Flebotte*, *supra* at 353 (childhood sexual abuse); *Commonwealth* v. *Young*, 401 Mass. 390, 398 (1987) (interracial murder); *Commonwealth* v. *Hobbs*, 385 Mass. 863, 873 (1982) (interracial sexual offenses against children); *Commonwealth* v. *Sanders*, 383 Mass. 637, 640-641 (1981)

---

sault and battery by means of a dangerous weapon of a thirteen year old girl. In 1978, Mr. Kater was arrested and charged with the kidnapping and murder of Mary Lou Arruda, which is the subject matter of this trial." They were then asked: "My first question to you is, do you have any difficulty accepting the fact that a person convicted of serious offenses such as kidnapping, attempted rape and assault and battery by means of a dangerous weapon may be released into the community?"

[6]After disclosing a portion of Kater's record, note 5, *supra*, the judge asked: "Would your ability to accept the principle of law that Mr. Kater is presumed to be innocent of the present charges be affected if you heard evidence that he had been convicted of kidnapping, attempted rape, and assault and battery, dangerous weapon, in 1968?"

(interracial rape). The judge's decision will not be disturbed on appeal "unless the complaining party demonstrates that there was a substantial risk that the case would be decided in whole or in part on the basis of extraneous issues." *Commonwealth* v. *Sheline*, 391 Mass. 279, 290-291 (1984).

Kater's obstacle is that the issue of his prior similar crime was not extraneous. An extraneous issue is one that goes beyond the record and raises a serious question of possible prejudice. *Commonwealth* v. *Cameron*, 385 Mass. 660, 668 n.8 (1982). Here, the issue of Kater's prior similar crime did not lie beyond the record. Evidence of the prior similar crime was fully relevant and probative on the issue of Kater's identity as the perpetrator. It was introduced for that purpose at trial. There was no abuse of discretion.

5. *Prior bad acts*. Kater next argues that the judge erred in allowing the Commonwealth to introduce evidence of his prior conviction and violated his rights under the Fifth and Fourteenth Amendments to the United States Constitution. "Evidence of prior bad acts generally is not admissible to prove bad character or propensity to commit the crime charged, but may be admissible if relevant for some other purpose." *Commonwealth* v. *Jackson*, 417 Mass. 830, 835-836 (1994), citing *Commonwealth* v. *Brusgulis*, 406 Mass. 501, 504-505 (1990), and cases cited. *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986). Evidence of prior bad acts may be admissible to prove identity if there is a special mark or distinctiveness in the way the acts were committed (i.e., in the modus operandi). *Commonwealth* v. *Jackson*, *supra*; *Commonwealth* v. *Brusgulis*, *supra* at 505; *Commonwealth* v. *Lacy*, 371 Mass. 363, 366 (1976).

The Commonwealth must show that "the prior events and the circumstances of the crime charged have such similarities as to be meaningfully distinctive. . . . There must be a uniqueness of technique, a distinctiveness, or a particularly distinguishing pattern of conduct common to the current and former incidents to warrant the admission of evidence of prior bad acts as tending to prove that the defendant was the person who committed the crime charged." (Citations omitted.) *Commonwealth* v. *Jackson*, *supra* at 836, quoting *Commonwealth* v. *Brusgulis*, *supra* at 505-506. It is not enough that there is some "general, although less than unique or distinct, similarity between the incidents." *Commonwealth* v. *Jackson*, *supra*, citing *Commonwealth* v. *Brusgulis*, *supra* at 507. Before evidence of a

prior bad act can be admitted, the trial court must find that (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, see *Commonwealth* v. *Trapp*, 396 Mass. 202, 206 (1985); (2) the jury could reasonably conclude by a preponderance of the evidence that the accused committed the other crime, *Commonwealth* v. *Leonard*, 428 Mass. 782, 785-786 (1999), and cases cited; (3) the evidence shows that the other act is similar enough in nature and close enough in time to be relevant to the matter in issue, see *Commonwealth* v. *Helfant, supra* at 225, 228; *Commonwealth* v. *Barrett*, 418 Mass. 788, 794 (1994); and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *Commonwealth* v. *Fordham*, 417 Mass. 10, 22 (1994). *Commonwealth* v. *Montanino*, 409 Mass. 500, 505-507 (1991). *Commonwealth* v. *Helfant, supra* at 224. When reviewing a trial judge's decision to admit evidence of prior bad acts to show identity, we inquire whether the judge committed palpable error. *Commonwealth* v. *Jackson, supra* at 836. *Commonwealth* v. *Fordham, supra* at 22-23.

Here, evidence of the prior crime was used to establish Kater's identity as the perpetrator of the crime against Arruda, an issue that was critical to the Commonwealth's case. The fact that Kater committed the other similar crime is not in dispute. We agree with the judge that the details[7] of the abduction of Jacalyn Bussiere and the abduction of Mary Lou Arruda are "strikingly similar." Significantly, both girls were bound in a

---

[7]The trial judge found the following facts:

"(1) Both victims were young, white girls, approximately the same age at the time of their abduction. Jacalyn Bussiere was thirteen. Mary Lou Arruda was fifteen.

"(2) Both victims were abducted while walking or riding their bicycles alone on a rural residential road.

"(3) Both victims were abducted in the afternoon.

"(4) Both victims were abducted and then placed in a car.

"(5) Both victims were brought to a dense wooded area within twenty miles of the site of their abduction.

"(6) Both victims were tied to a tree. Both were tied in a similar manner. Although Bussiere was tied with cloth and Arruda was tied with twine, both girls were bound to the tree from head to toe, and both were bound around the neck. Both victims were fully clothed.

"(7) Both victims were left in an area of the woods where they could not have been easily found and where their cries for help would have been dif-

way that was designed to cause death by strangulation when the subject's head fell forward from sleep or fatigue. The similarities are so strong and the modus operandi is so distinctive as to make the evidence highly probative. This is as close as a crime gets to being a "signature crime." Although the abduction of Jacalyn Bussiere occurred ten years before the abduction of Mary Lou Arruda, we agree with the judge that the length of time between the two crimes is not so temporally remote as to preclude admission of the earlier offense because Kater spent most of that ten-year period in prison.[8] See *Commonwealth* v. *Helfant, supra* at 228 n.13 (no bright-line test for determining remoteness of evidence of prior misconduct). See also *Walters* v. *Maass*, 45 F.3d 1355, 1357-1358 (9th Cir. 1995) (earlier bad acts not too remote in time because defendant spent nearly all of intervening period in prison); *Featherstone* v. *Estelle*, 948 F.2d 1497, 1502 (9th Cir. 1991) (reappearance of unique signatures after appellant's release from nine-year prison term strengthens inference that appellant committed later crimes); *United States* v. *Hernandez*, 896 F.2d 513, 522-523 (11th Cir.), cert. denied, 498 U.S. 858 (1990) (six-year period between offenses does not attenuate probity of prior crime because defendant was in jail for much of the interim). The evidence of the prior bad act was relevant to the issue of identity and its probative value was compelling. As such, while prejudicial to Kater's case, it was not unfairly so. There was no error.

6. *Previously hypnotized witnesses.* Kater next argues that he was denied the right to a fair trial and the right to effectively cross-examine witnesses because they previously had been hypnotized. He claims that a witness's memory after hypnosis is so irreparably altered that the witness cannot be cross-examined in a meaningful way, and thus a person who has been hypnotized must be forever barred from testifying on the matter thus affected. Specifically, he argues that the previously hypnotized witnesses should not have been allowed to testify that the car they saw around the time of Arruda's disappearance was similar in color, size, and markings to his car. Kater

ficult to hear.

"(8) It is reasonable to infer that both girls were left in the woods to die.

"(9) Both victims were abducted within a thirty minute drive from Kater's home."

[8]In August, 1976, he was released to the community on parole. In September, 1978, barely two years later, Mary Lou Arruda disappeared.

complains that such testimony was not part of any prehypnotic record, and that any attempt to cross-examine the witnesses on dissimilarities would create a situation whereby posthypnotic statements, both exculpatory and inculpatory, could be introduced at trial in violation of our prior mandates.

We previously addressed this issue in *Kater I*, where we said that hypnotically aided testimony is inadmissible at trial because it is unreliable.[9] *Commonwealth* v. *Kater*, 388 Mass. 519, 520-521 (1983). In *Kater II*, *Kater III*, and *Kater IV*, we ordered that admissible prehypnotic evidence be separated from the inadmissible hypnotically aided testimony of the trial witnesses. *Commonwealth* v. *Kater*, 394 Mass. 531, 533 (1985). *Commonwealth* v. *Kater*, 409 Mass. 433, 441-444 (1991). *Commonwealth* v. *Kater*, 412 Mass. 800, 802 (1992). In *Kater IV*, *supra* at 805-806, we said that the witnesses could be asked "whether there are any similarities or differences between the defendant's automobile and the one they observed at the scene." See *Kater* v. *Commonwealth*, 421 Mass. 17, 18-19 (1995).

Exceeding our directive in *Kater I*, *Kater II*, and *Kater III* in a manner more favorable to the defendant, the judge permitted previously hypnotized witnesses to testify only to facts that were *documented* in the record *before* their hypnosis procedures were performed. We believe that such limitations on the witnesses eliminated the risk that their testimony might be affected by hypnosis. To the extent that Kater was faced with the difficult choice of either refraining from asking a question on cross-examination or risk opening the door to damaging evidence, his choice was no different from those faced by other defendants who succeed in suppressing certain evidence. They either forgo certain areas of cross-examination or forfeit the benefit of suppression. The defendant raises no issues here that this court has not already considered. There was no error.

7. *Loss or destruction of evidence.* Kater argues that the Commonwealth's loss or destruction of evidence violated his right to due process under both State and Federal constitutional law. Specifically, he claims that the Commonwealth destroyed potentially exculpatory evidence by failing to preserve a wooden cross and other paraphernalia found in Freetown State Forest. He also argues that the loss of several other items, all of which

---

[9]We have not, however, viewed the issue on this record as one which implicates constitutional principles. See *Commonwealth* v. *Kater*, 388 Mass. 519, 533 (1983) (*Kater I*).

were the subject of previous motions to dismiss that were denied and subsequently reviewed by this court, have created a cumulative prejudicial effect that requires reversal.

The Commonwealth has a duty to preserve exculpatory evidence for the defendant to inspect, examine or perform tests on, if the defendant so chooses. *Commonwealth* v. *Harwood, ante* 290, 295 (2000); *Commonwealth* v. *Neal*, 392 Mass. 1, 10-12 (1984). This duty "extend[s] to material and information in the possession or control of members of [the prosecutor's] staff and of any others who have participated in the investigation or evaluation of the case." *Commonwealth* v. *St. Germain*, 381 Mass. 256, 261 n.8 (1980). When a defendant claims he is prejudiced by missing evidence, the trial judge must consider and weigh the materiality of the evidence, the potential prejudice to the defendant, and the culpability of the Commonwealth. *Commonwealth* v. *Harwood, supra.* See *Commonwealth* v. *Hunter*, 426 Mass. 715, 718 (1998), quoting *Commonwealth* v. *Sarourt Nom*, 426 Mass. 152, 159 (1997). "Evidence is material if, in considering the entire record, it creates a reasonable doubt as to the defendant's guilt that would not otherwise exist." *Commonwealth* v. *Harwood, supra* at 295, quoting *Commonwealth* v. *Otsuki*, 411 Mass. 218, 231 (1991). The defendant must establish a " 'reasonable possibility, based on concrete evidence rather than a fertile imagination,' that access to the [destroyed material] would have produced evidence favorable to his cause." *Commonwealth* v. *Neal, supra* at 12, quoting *State* v. *Michener*, 25 Or. App. 523, 532 (1976). In short, the defendant must establish a reasonable possibility that the lost or destroyed evidence was exculpatory. *Commonwealth* v. *Sasville*, 35 Mass. App. Ct. 15, 20-21 (1993). The Commonwealth is culpable if the evidence has been lost or destroyed through its negligence or inadvertence. *Commonwealth* v. *Harwood, supra*; *Commonwealth* v. *Olszewski*, 401 Mass. 749, 757 n.7 (1988), *S.C.*, 416 Mass. 707 (1993), cert. denied, 513 U.S. 835 (1994). We accept the trial judge's subsidiary findings of fact absent clear error. *Commonwealth* v. *Harwood, supra*; *Commonwealth* v. *Waters*, 420 Mass. 276, 279 (1995). See *Commonwealth* v. *Lam Hue To*, 391 Mass. 301, 307 (1984), quoting *Commonwealth* v. *Aarhus*, 387 Mass. 735, 742 (1982). "If the loss of evidence threatened the defendant's right to a fair trial, the judge has discretion concerning the manner in which to protect the defendant's rights." *Commonwealth* v. *Lydon*, 413 Mass.

309, 317 (1992), quoting *Commonwealth* v. *Henderson*, 411 Mass. 309, 310 (1991).

On November 18, 1978, one week after he discovered Arruda's body in Freetown State Forest, a Freetown police officer discovered a large wooden cross at or near the edge of Freetown State Forest, approximately one mile from where Arruda's body had been found. In the immediate area were lengths of yellow twine, leather or rubber straps, a tee shirt and shorts, a towel, and a paper bag. Stains, possibly blood, were on some of the items. The police officer took five photographs of the cross and related items, but he did not seize or secure them. Instead, he left them in the woods where he found them. Based on the nature and location of the cross and other items,[10] he concluded that they were not related to Arruda's murder, nor to any other criminal activity. The next day, the officer delivered the negatives from the entire roll of film, together with the Arruda autopsy report, to the district attorney's office, but he did not write a report or otherwise advise the district attorney of his findings or observations concerning the cross.

In April, 1980, a local newspaper published an article entitled "Satanic cult may be linked to murders." Accompanying the article was a copy of a print of one of the photographs the officer had taken on November 18, 1978. Fourteen years later, in 1994, Kater moved for production of police reports concerning ritualistic ceremonies near the area where Arruda's body was found. The motion judge, who was also the trial judge, denied his motion without prejudice. In 1996, the district attorney delivered to the defense copies of the five photographs of the cross in Freetown State Forest taken on November 18, 1978.

The judge found that the Commonwealth had no duty to preserve or produce the cross and related items because they were not in the Commonwealth's custody or control. He also found that the cross and related items were not material to the case, and therefore not exculpatory. He reached a similar conclusion regarding the photographs. Although the Commonwealth had the photographic negatives of the cross and related items in its possession since late 1978 and failed to disclose them to the

---

[10]The thick, bright yellow plastic twine on the cross was not consistent in color or material with the thin and hairy fibrous twine found on Arruda's body. Nor was there any clear or direct access between the two locations.

defense until 1996, the judge found no evidence of bad faith.[11] The judge also found that the Commonwealth's culpability for the late disclosure of the photographs was not so egregious as to warrant the extreme remedy of dismissal or the exclusion of prior bad act evidence. Instead, he ruled that Kater would be allowed to use the photographs to impeach the Freetown officer's credibility at trial. Kater was able to develop his points adequately. There was no error.

Kater further argues that the cumulative loss or destruction of several other pieces of evidence has denied him the right to a fair trial, and that dismissal of the indictments is the only proper remedy available.[12] We briefly address each objection.

(a) *Missing negatives and photographs.* The defendant complains that only five out of the six to twelve photographs of the automobile tire track found near Arruda's bicycle remain. None includes identifying points of reference to determine where, in relation to Arruda's bicycle or other landmark, the automobile tire print was actually located. Kater claims that the missing photographs are exculpatory because he might have been able to prove that Kater's vehicle did not strike Arruda's bicycle. Even if such a fact had been proved, it likely would not have created a reasonable doubt as to Kater's guilt.[13]

(b) *Police notes on reenactment.* On September 13, 1978, the police conducted a reenactment of Arruda's abduction. During the reenactment, they took notes. The notes are now missing. Kater claims that the notes could contain evidence useful to the defense for impeachment of witnesses as to times and locations. A police officer involved in the reenactment was available for cross-examination. Kater has not shown, beyond his fertile

[11]The judge noted that, "[i]n the circumstances of this case, which covers eighteen years, three trials, six appeals, hundreds of items of evidence, thousands of pages of transcripts, many witnesses and several attorneys for both the Commonwealth and Kater, it is reasonable to conclude that the Commonwealth was probably unaware of the contents of the photographic negatives of the cross and related items until 1996. The fact that [the Freetown police officer] neither reported his discovery to the Commonwealth nor considered himself under an obligation to do so lends further support to this conclusion."

[12]In his denial of Kater's pretrial motion to dismiss on the same issue, the trial judge noted that an objection as to each piece of lost or destroyed evidence had been previously raised and denied. Kater does not suggest otherwise.

[13]We note that Kater did not strike Jacalyn Bussiere with his car either.

imaginings, that the evidence contained in the notes would create a reasonable doubt as to his guilt. See *Commonwealth* v. *Neal*, 392 Mass. 1 (1984).

(c) *Handlebar plug on Arruda's bicycle.* The Commonwealth conducted two types of tests on the handlebar plug of Arruda's bicycle. One was for chemical composition and the other was for tool marks. The chemical tests were within the scope of the judge's order and Kater received notice of them. The results of the chemical tests were inconclusive as to whether the handle bar plug on Arruda's bicycle had ever made contact with Kater's car. Kater was allowed to cross-examine the Commonwealth's witness on the chemical test procedures and the results obtained. In violation of the judge's discovery order, the Commonwealth also conducted a tool mark test on the handlebar plug. During that testing, which involved a destructive process, new abrasions were left on the handlebar and may have altered the original abrasions or striations. The judge found that the evidence was material and that the resulting damage to the plug was prejudicial to the defendant. The judge excluded testimony of the Commonwealth's witness who performed the tool mark test. This was an appropriate remedy. See *Commonwealth* v. *Gliniewicz*, 398 Mass. 744, 749 (1986). In the absence of any indication that the original abrasions could have created a reasonable doubt as to Kater's guilt, dismissal of the indictment was not required. As noted above, the Commonwealth's case did not depend on Kater's car striking Arruda's bicycle.

(d) *Police notes from interview with Arruda's mother.* On September 10, 1978, police interviewed Mary Lou Arruda's mother as to what she saw out her living room window on the day her daughter disappeared. The notes from that interview were lost. Kater claims that Mrs. Arruda's credibility was open to serious question because she was the only witness who testified to seeing a black stripe as opposed to a silver stripe on the bright green Opel, and that the police did not recall her mentioning a black stripe on the day of the interview. He argues that he could have used the notes to impeach her. The defendant thoroughly cross-examined Mrs. Arruda on the issue of the black stripe. He failed to show that anything in the police notes would have created a reasonable doubt as to his guilt.

(e) *Sample paint chip.* Kater argues that, during pretrial discovery, three witnesses were shown color charts at a car dealership and all three picked out a bright yellow chip as

representative of the color of the car they saw speeding through Arruda's neighborhood at the time she disappeared. The paint chip is now missing. Kater argues that loss of the chip, along with witnesses' various "inconsistent" descriptions of the color of the car as lime green, apple green, dark green, bright green, and chartreuse green, create a reasonable possibility that the color of his car has been misidentified. We note that more than three witnesses saw and testified to the color of Kater's car on the day Arruda disappeared, and all of them stated that the car was green. Also, on or about the day Arruda disappeared, two of the three witnesses about whom Kater now complains provided police a green blouse and a green comb, respectively, as representative samples of the color of the car they saw speeding through their neighborhood at the time of Arruda's disappearance. Both items were admitted in evidence. Kater fails to show that production of the missing paint chip would create a reasonable doubt as to his guilt. The cumulative effect of the lost evidence did not create a serious likelihood of a miscarriage of justice.

8. *Prosecutor's statements.* Kater also argues that the prosecutor's statements were highly improper and prejudicial, and thus require reversal of the convictions and a new trial. He contends that the closing was generally inflammatory, that the prosecutor committed reversible error and violated our earlier mandates by referring to facts not in evidence, and that the prosecutor improperly used evidence of Kater's prior bad acts to show his propensity for committing the crime. We disagree.

A prosecutor may argue "forcefully for a conviction based on the evidence and on inferences that may reasonably be drawn from the evidence."[14] *Commonwealth* v. *Kozec,* 399 Mass. 514, 516 (1987). When a defendant raises a claim of error regarding a prosecutor's closing argument, we consider (1) whether the defendant seasonably objected; (2) whether the error was limited to collateral issues or went to the heart of the case; (3) what specific or general instructions the judge gave the jury which may have mitigated the mistake; and (4) whether the error, in

---

[14]"On the other hand, a prosecutor should not refer to the defendant's failure to testify, misstate the evidence or refer to facts not in evidence, interject personal belief in the defendant's guilt, play on racial, ethnic, or religious prejudice, or on the jury's sympathy or emotions, or comment on the consequences of a verdict." (Footnotes omitted.) *Commonwealth* v. *Kozec,* 399 Mass. 514, 516-517 (1987).

the circumstances, possibly made a difference in the jury's conclusions. *Commonwealth* v. *Kozec, supra* at 518. See *Commonwealth* v. *Wilson*, 427 Mass. 336, 351 (1998). "[T]he entire record, including the balance of the prosecutor's argument, [is] relevant in determining whether the error was prejudicial to the point of requiring a reversal of the conviction." *Commonwealth* v. *Kozec, supra* at 523. If the defendant makes no timely objection to the prosecutor's closing argument, our review is limited to whether there was a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Johnson*, 429 Mass. 745, 748 (1999). An objection is timely if made at the close of the prosecutor's argument. *Commonwealth* v. *Kozec, supra* at 518 n.8.

After the prosecutor's closing argument, Kater timely objected and moved for a mistrial on the ground that the argument played on the jurors' sympathy. He complained that it was emotional and jurors were crying, that the prosecutor had displayed a photograph of Mary Lou Arruda on a "visual presenter" as he spoke, and that the prosecutor said that Arruda had "begged for her life." The judge denied the motion, explaining that he did not think the closing went beyond the bounds of fair argument; the use of the visual presenter to display the photograph was no different from using an enlarged easel; both sides had used the visual presenter; a certain level of emotion on the part of the jurors could be expected from this type of trial; and the prosecutor had not argued that Arruda had begged for her life, but had prefaced the phrase with the word "whether," as one would do when posing a question. There was no error by the prosecutor or the judge.

On the day after the prosecutor gave his closing argument, before the judge instructed the jury, Kater renewed his motion for a mistrial, claiming that the prosecutor impermissibly referred to facts not in evidence when he stated that three previously hypnotized witnesses had positively identified Kater and Kater's car the day Arruda disappeared. The judge denied the motion. Recognizing, however, that the argument may have been inconsistent with our previous mandates prohibiting posthypnotic testimony, he instructed the jury that there was no evidence that the three witnesses had made a positive identification of Kater or his car on the day Arruda disappeared. He then told the jury they would have to decide, based on their memory of the testimony, whether the person the witnesses saw driving a particular car was Kater. He also instructed that what the

lawyers said in their closing was not evidence and that the Commonwealth had to prove beyond a reasonable doubt that Kater killed Arruda. The judge correctly instructed the jury. His curative instruction specifically and appropriately eliminated any prejudice that might have been caused by the prosecutor's comment. See *Commonwealth* v. *Amirault*, 404 Mass. 221, 239 (1989).

On the fourth day of jury deliberations, Kater objected to the prosecutor's use of the word "capable" in his closing, complaining that it was an impermissible propensity argument.[15] The day after the jury returned their guilty verdicts, he formally moved for a mistrial. The judge denied the motion. The prosecutor's use of the word "capable" in this context was not a reference to Kater's character or propensity, but rather whether he was able to perform the act in light of his alibi. There was no error.

9. *Review pursuant to G. L. c. 278, § 33E.* We have reviewed the entire record pursuant to our obligation under G. L. c. 278, § 33E, and conclude that neither a reduction in the murder verdict nor an order for a new trial is warranted.

*Judgments affirmed.*

---

[15]After discussing Kater's ability to commit the crimes in light of the evidence supporting his alibi, the prosecutor made the following statement during his closing argument: "Does he have a motivation to lie in this case? Think about it. Because you have to decide whether he's capable on September 8th of driving up behind a little girl who's on a bicycle, kidnapping her, driving her to a forest, tieing [*sic*] her hands behind her back to a tree, tieing her feet to a tree, and then strangling her. Think about it."